J. L. JOHNSON *v.* CONTINENTAL INSURANCE COMPANY OF NEW YORK.

*(Knoxville.* September Term, 1907.)

1. **PAROL EVIDENCE.** Inadmissible to vary insurance policy and premium notes providing for nonliability on policy for nonpayment of premium.

Where a fire insurance policy and the premium notes given therefor provide that the insurer shall not be liable for any loss or damage occurring while any premium remains past due and unpaid, parol evidence is inadmissible in an action on the policy to show a waiver of such provision made by the agent of the insured before and at the time of executing the notes and making the insurance contract. (*Post, pp.* 601-610.)

Cases cited and approved: Richardson v. Thompson, 1 Humph., 154; Campbell v. Upshaw, 7 Humph., 185; Hancock v. Edwards, 7 Humph., 349, 354; Blakemore v. Wood, 3 Sneed, 474; Ellis v. Hamilton, 4 Sneed, 514; Bryan v. Hunt, 4 Sneed, 544, 545, 546, 547; Bridges v. Robinson, 2 Tenn. Chy., 723; Rice v. Steger, 3 Tenn. Chy., 328; Bender v. Montgomery, 8 Lea, 586, 593; Stewart v. Insurance Co., 9 Lea, 104, 112; Klein v. Kern, 94 Tenn., 37; Hines v. Willcox, 96 Tenn., 158; Lewis v. Turnley, 97 Tenn., 197; Lyons v. Stills, 97 Tenn., 514; Quigley v. Shedd, 104 Tenn., 560; Myers v. Taylor, 107 Tenn., 364; Turner v. Abbott, 116 Tenn., 718; Insurance Co. v. Mowry, 96 U. S., 544, and numerous cases from other States cited in the opinion on pages 608-610.

2. **INSURANCE.** Evidence of agent's statement that he would take care of an installment policy for insured is inadmissible.

In an action on a fire insurance policy for a loss resisted on the ground of forfeiture of the policy for nonpayment of the

Johnson v. Insurance Co.

premium, evidence of a statement made by the agent to the father of the insured, subsequent to the making of the contract, that he would take care of the policy for the insured, is incompetent and inadmissible because not made in the course of the business or employment of the defendant, and because immaterial and irrelevant. (*Post, pp.* 610-612.)

3. **SAME. Same. Statements of agent of insurer insufficient to waive forfeiture of policy for nonpayment of premium.**

In an action on a fire insurance policy for a loss resisted on the ground of forfeiture of the policy for nonpayment of the premium, statements made to the insured by the insurer's agent, through whom the policy was issued, that he was attending to the insurance for the insured, and if the house is burned that the insured would get his money, are insufficient to justify the insured in assuming that he would recover for a loss after he had failed to recover a premium according to his contract. (*Post, pp.* 612, 613.)

4. **SAME. Forfeiture for nonpayment of installment premium is not waived by indulgence as to previous installments, when notified to the contrary.**

Where the insured, before maturity of an installment of premium, received notice from the insurer that on failure to pay the premium at maturity the policy would be suspended, and after maturity, a notice that because of the nonpayment the policy had been suspended and would remain so while the premium remained unpaid, he could not have been misled into believing that the policy was still in force, and not suspended because of a previous indulgence in being allowed to pay a premium after maturity. (*Post, pp.* 613-618.)

5. **SAME. No reinstatement of policy by payment of past due premium made after the insured property was burned.**

. There can be no reinstatement of a policy forfeited for nonpayment of an installment premium by a payment made after the insured property had been destroyed by fire, since there

could be nothing upon which the policy could operate. (*Post, p.* 618.)

6. **SAME.** Policy forfeited for nonpayment of installment premium is not revived by payment accepted without knowledge that property had been burned, when.

A fire insurance policy is not revived, after the insured property is burned, and after the forfeiture of the policy for the nonpayment of an installment premium, by the insured's payment of such premium to a clerk of the insurer's agent who had issued the policy or procured its issuance, without their knowledge that the property had been burned. (*Post, pp.* 618, 619.)

---

FROM KNOX.

---

Appeal from the Chancery Court of Knox County.—JOSEPH W. SNEED, Chancellor.

THOMAS L. CARTY, for complainant.

WEBB, McCLUNG & BAKER, for defendant.

---

MR. JUSTICE NEIL delivered the opinion of the Court.

This action was brought in the chancery court of Knox county on an insurance policy to recover $1,500, the amount of insurance on the property described in the policy. There was a decree entered in favor of the complainant for the amount of the policy and interest,

and from this an appeal was prayed and prosecuted to this court, and errors have here been assigned in behalf of the defendant. The complainant also assigned errors on the ground that the chancellor failed to allow to him the twenty-five per cent. penalty provided by statute in cases where the defenses are frivolous.

In order to properly understand the points made in the assignments of error filed by the defendant, it is necessary to state that Blackburn Bros. acted as agents of the company in securing the policy; that at the time the application was made, and an installment note executed for the premium, certain statements were made by Robert J. Blackburn, the member of the firm who conducted the matter, and these statements were objected to on the hearing below as incompetent. There were likewise statements of Blackburn proven by the wife of Mr. Johnson, and also by his father; the latter at a different time. All of these were objected to in the court below, but the objections were overruled. We shall presently state the substance of the evidence objected to and the grounds of the objection.

The installment note which was given for the premium was in the following words and figures:

"The company is authorized to insert in this note the number and date of policy.

"$116.40. For value received in policy No. B ———, dated the ——— day of ———, 190—, issued by the Continental Insurance Company of New York, I promise to pay to said company, or order, at their office in

Chicago, Illinois, with expenses of collection and attorney's fees, and without relief from valuation or appraisement laws, one hundred and sixteen and $\frac{40}{100}$ dollars, in installments as follows:

"$29.10 upon the first day of December, 1902, and

"$29.10 upon the first day of December, 1903, and

"$29.10 upon the first day of December, 1904, and

"$29.10 upon the first day of December, 1905, without interest.

"And it is hereby agreed that, in case of nonpayment of any one of the installments herein named at maturity, this company shall not be liable for loss during such default, and the policy for which this note was given shall lapse until payment is made to this company in New York or to the Western Department at Chicago, and in the event of nonsettlement for time expired, as per terms on short rates, the whole amount of installments remaining unpaid on said policy may be declared earned, due, and payable, and may be collected by law. Given in payment for a policy of insurance. If transferred either before or after maturity, this obligation shall be subject to all defenses as if owned by the payee herein named.

"J. L. JOHNSON."

The note was sent on to the company at Chicago, and some days afterwards a policy was sent to the complainant, and this contained the following upon the same subject covered by the provision at the bottom of the note, viz.:

"But it is expressly agreed that this company shall not be liable for any loss or damage that may occur to the property herein mentioned while any promissory note or obligation, or any part thereof, given for the premium, remains past due and unpaid."

The chief evidence objected to was contained in the deposition of Mr. Johnson, to the effect that during the negotiation for the policy, and before the execution of the note, at the time he was negotiating with the agent about the execution of the note, his attention was called to the dates of payment of the installments, and to the forfeiture clause appearing in the last paragraph of the note, and he told the agent that he was engaged in the contracting business, and could not get his money promptly, and did not know whether he would be able to pay the installments when they became due; that thereupon the  agent said to him that he need not pay the installments when they became due, but could take his own time to make the payments when he got the money; and that he would waive, for the company, the provision for forfeiture, based on the failure to pay the installments when due.

Mr. Johnson testified in substance that he relied on this statement of the agent and executed the note.

This testimony was objected to on the ground that its purport and effect was to vary a written contract.

This objection was overruled by the chancellor.   In this we think his honor erred.

There are a great many cases in our reports upon the

general subject; some stating the rule, and some the exceptions to the rule. It is often difficult to decide when a case falls within one of the exceptions. The rule is that the contract cannot be contradicted or varied by parol. There are exceptions to the effect that an independent collateral agreement may be proven, and also that, when a prior parol contract is only partly reduced to writing, parol evidence may be heard to supply the parts omitted from the writing. The rules and many exceptions may be found stated in the case of *Hines* v. *Willcox*, 96 Tenn., 158, 33 S. W., 914, 34 L. R. A., 824, 832, 54 Am. St. Rep., 823. But it has never been held that the added matter could contradict the written portion of the contract, or the written contract; but the direct reverse has been held.

In *Stewart, Gwynne & Co.* v. *Insurance Co.*, 9 Lea, 104, 112, it is said:

"It will be observed that under these authorities parol proof may be heard as to an independent collateral agreement, or where there has been a parol agreement, and a part only reduced to writing, the whole contract may be proven; but in neither case is the writing to be contradicted." Again, on page 113, the court said: "We think the evidence was properly rejected. It was certainly not an independent collateral agreement. There was but the one contract, either the one specified in the receipt or the parol contract which the defendants offered to prove. Both contracts cannot stand. They are different in their terms and in their practical results,

and one must give way to the other. Nor is it a case where only part of the contract was reduced to writing. As we have seen in such cases, there is to be no conflict between the parol contract and the writing. They stand together and are consistent. The only difference is the writing does not embrace it all. In our opinion, the parol proof in this case contradicts the writing, and is therefore not admissible."

It has often been held that parol proof cannot be heard to show that a promissory note was payable at a different time and in a different manner from that set forth in the instrument itself. *Hancock & Powell* v. *Edwards,* 7 Humph., 349, 354; *Campbell* v. *Upshaw,* 7 Humph., 185, 46 Am. Dec., 75; *Ellis* v. *Hamilton,* 4 Sneed, 514; *Bender* v. *Montgomery et al.,* 8 Lea, 586, 593.

The general rule upon the subject is well stated in *Bryan* v. *Hunt,* 4 Sneed, 544, 545, 70 Am. Dec., 262:

"It is a well-settled rule of the common law, independently of the statute of frauds, that where a contract has been reduced to writing, and is complete in its terms and free from ambiguity, verbal evidence is not allowed to be given of what passed between the parties, either before the written instrument was made, or during the time it was in a state of preparation, so as to add to or subtract from, or in any manner to vary or qualify, the written contract. The written instrument must be considered as containing the true agreement between the parties, and as furnishing the best evidence of their

final intentions and acts. And this rule, excluding prior or contemporaneous stipulations or conversations, applies with no less force to simple contracts than to contracts by specialty." See, also, *Richardson* v. *Thompson,* 1 Humph., 154; *Blakemore* v. *Wood,* 3 *Sneed,* 474; *Bridges* v. *Robinson,* 2 Tenn. Ch., 723; *Rice* v. *Steger,* 3 Tenn. Ch., 328; *Klein* v. *Kern,* 94 Tenn., 37, 28 S. W., 295; *Hines* v. *Willcox,* 96 Tenn., 158, 33 S. W., 914, 34 L. R. A., 824, 832, 54 Am. St. Rep., 823; *Lewis* v. *Turnley,* 97 Tenn., 197, 36 S. W., 872; *Lyons* v. *Stills,* 97 Tenn., 514, 37 S. W., 280; *Quigley* v. *Shedd,* 104 Tenn., 560, 58 S. W., 266; *Myers* v. *Taylor,* 107 Tenn., 364, 64 S. W., 719; *Turner* v. *Abbott,* 116 Tenn., 718, 94 S. W., 64, 6 L. R. A. (N. S.), 892.

In *Insurance Co.* v. *Mowry,* 96 U. S., 544, 24 L. Ed., 674, it is said:

"By the express conditions of the policy the liability of the company was released by the failure of the assured to pay the premium when it matured, and the plaintiff could not recover unless the force of this condition could in some way be overcome. He sought to overcome it by showing that the agent, who induced him to apply for the policy, represented to him, in answer to suggestions that he might not be informed when to pay the premiums, that the company would notify him in season to pay them, and that he need not give himself any uneasiness on that subject; that no notification was given him before the maturity of the second premium, and for that reason he did not pay it at the

time required.  This representation before the policy was issued, it was contended in the court below and in this court, constituted an estoppel upon the company against insisting upon the forfeiture of the policy.

"But to this position there is an obvious and complete answer.  All previous verbal arrangements were merged in the written agreement.  The understanding of the parties as to the amount of the insurance, the conditions upon which it should be payable, and the premium to be paid was there expressed for the very purpose of avoiding any controversy or question respecting them.  The entire agreement of the parties, with all the conditions upon which its fulfillment could be claimed, must be conclusively presumed to be there stated.  If by inadvertence or mistake provisions other than those intended were inserted, or stipulated provisions were omitted, the parties could have recourse for a correction of the agreement to a court of equity, which is competent to give all needful relief in such cases; but, until thus corrected, the policy must be taken as expressing the final understanding of the assured and of the insurance company.

"The previous representations of the agent could in no respect operate as an estoppel against the company. Apart from the circumstance that the policy, subsequently issued, alone expressed the contract, an estoppel from the representations of a party can seldom arise, except when the representation relates to a matter of fact—to a present or past state of things.  .  .  .  An

estoppel cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made. . . . The doctrine, carried to the extent for which the assured contends in this case, would subvert the salutary rule that the written contract must prevail over previous verbal agreements, and open the door to all the evils which that rule was intended to prevent."

In *Kimball* v. *Aetna Insurance Co.*, 9 Allen (Mass.), 540, 85 Am. Dec., 786, it appeared that the building covered by the policy of insurance was vacant at the time the policy was issued; but the assured agreed orally with the agent that it should be thereafter occupied, but this was never done. A loss subsequently occurring, it was held that the oral agreement was no defense to a recovery on the policy. The court said:

"An oral representation as to a future fact, honestly made, can have no effect; for, if it is a mere statement or expectation, subsequent disappointment will not prove that it was untrue, and if it is a promise that a certain state of facts shall exist or continue during the term of the policy it ought to be embodied in the written contract."

In Ostrander, on Fire Insurance (2d Ed.), section 358, it is said: "Where the policy made out and accepted by the insured provided that it would become void if the premises thereafter became vacant, and a vacancy subsequently occurred during the term of the insurance, it was held, on an action to recover under

the policy, that plaintiff could not plead and show by parol testimony that defendant's agent had agreed with the plaintiff, when negotiating the insurance, that, if the premises should become vacant during the term of the policy, the insurance would continue valid, notwithstanding the inhibitory provision of the contract. To give legal effect to such executory agreements, in contravention of the plain terms of the written instrument, would be to set aside well-settled and important rules of law (citing *Hartford Fire Insurance Co.* v. *Davenport,* 37 Mich., 613; *Havens* v. *Insurance Co.,* 111 Ind., 90, 12 N. E., 137, 60 Am. Rep., 689; *Bennett* v. *Insurance Co.,* 55 N. J. Law, 377, 27 Atl., 641; *Virginia Fire & Marine Insurance Co.* v. *Morgan,* 90 Va., 290, 18 S. E., 191; *Union Central Life Insurance Co.* v. *Chowning,* 8 Tex. Civ. App., 455, 28 S. W., 117; *Phenix Insurance Co.* v. *Wilcox & Gibbs Guano Co.,* 13 C. C. A., 88, 65 Fed., 724.)"

The author adds:

"As the subject of a parol agreement relating to a future performance, estoppel would not arise. Mr. Bigelow, in his consideration of this question, reaches a conclusion sustaining the proposition here contended for. He says: 'The representation or concealment must also in all cases have reference to a present or past state of things; for, if a party make a representation concerning something in the future, it must generally be either a mere statement of intention or opinion, uncertain in the

119 Tenn.—39

knowledge of both parties, or it will come to a contract, with the peculiar consequences of a contract' "—citing Bigelow, Estop. (2d Ed.), p. 438.

The case of *Walton* v. *Agricultural Insurance Co.,* 116 N. Y., 326, 22 N. E., 443, 5 L. R. A, 677, is also referred to, wherein it appeared that the agent who took the application agreed with the insured that the title to the property might thereafter be changed without prejudice to his rights. The court held that such agreement was nugatory, as against the prohibition contained in the policy.

We think the testimony under examination was clearly at variance with the contract as expressed in the note and in the policy, and that the complainant could not have the benefit of the matter covered by this proposed testimony, except on a bill to reform the contract for mistake or fraud.

We are referred to the case of *J. J. White* v. *Home Insurance Co.* (MS. opinion of the court of chancery appeals), the decision in which case was subsequently affirmed by this court, in which similar evidence was considered. But that was a bill to reform the contract, and, of course, the evidence would be competent under such circumstances. In the present case we have a suit simply on the policy, and an objection to the evidence as being a variation of the writing. The difference is vital.

The remaining testimony objected to applies to statements made by Blackburn, the agent, after the execution and delivery of the policy.

The difference between statements of the latter character and those that are made preceding and during the negotiation for the contract is thus marked in *Bryan* v. *Hunt,* supra:

"Though all verbal negotiations and stipulations between the parties to a written agreement, anterior to or contemporaneous with the execution of the instrument, are in general to be regarded as merged in it, it is well settled that the rule has no application to stipulations or agreements made between the parties subsequent to the execution of the written instrument.

"Agreements not by specialty, whether written or unwritten, are of the same grade and dignity, in law, and are denominated 'simple contracts.' Hence it follows that to admit evidence of a subsequent parol agreement, for the purpose of showing an abandonment, discharge, or alteration of the terms of a previous written agreement not under seal, would not be to affect or dissolve the agreement by matter of an inferior nature; and therefore it is generally admitted that it is competent to the parties to an executory written contract not under seal, at any time before breach thereof, by a subsequent verbal agreement founded on a sufficient consideration, either to waive altogether or dissolve or annul the previous written agreement, or in any manner to add to, subtract from, or vary or qualify the stipulations of such agreement, and thus to make a new or different contract."

4 Sneed, 546, 547, 70 Am. Dec., 262.

The evidence of declarations made by the agent, subsequent to the making of the contract, were in substance these:

J. L. Johnson, Sr., the father of the complainant, testified that, a day or two after the insurance contract under examination therein was made, Blackburn called upon him, and asked him to use his influence with his son to induce him to take out a life insurance policy with the said Blackburn; that he declined to do this, on the ground that the complainant would have enough to do to pay the premium on the fire policy; that Blackburn replied that he need not mind this, because he (Blackburn) would take care of John in his policies.

This evidence was objected to, because not made in the course of the business or employment of the defendant company, and because immaterial and irrelevant.

We think the evidence was incompetent on both grounds.

There are certain other statements of Blackburn, testified to by complainant himself as made after the delivery of the policy, and which do not seem to be objected to. The substance of this testimony may be set forth in the following questions and answers:

"Q. State whether or not you ever requested either of the Blackburn Bros. not to allow your policy to lapse on the day your installment was due. A. Well, when he would name the life insurance business, I would tell him that the fire insurance was about all I could keep up, and he just made the remark that 'if your house

gets burned up you will get your money.' That is about all the talk we ever had.  Q.   State whether or not you had had any conversation with Blackburn Bros., or either of them, prior to December 1, 1904, with respect to the installment note then due or to become due on December 1st.  A.   Well, nothing more than I have stated.   Whenever I met him he would ask me about the life insurance, and I would tell him if I kept up the fire insurance I would be all right, and he would say: 'I am attending to that for you.   Your insurance is all right.   If your house ever gets burned up, you will get your money.'  That was about his reply all the time."

There was nothing in these statements which would justify the complainant in assuming that in case of a loss he would receive the insurance money, even though he should fail to pay premiums according to the terms of his contract.  This evidence, considered aside from that which has been excluded as incompetent, was wholly indeterminate.

We shall now consider the last ground upon which it is insisted there can be a recovery.

Complainant insists that a custom or habit of business was established between the company and himself, whereby he was permitted to pay his premium for the two preceding years after the date of maturity, and they were received by the company.  He says the origin of the practice on his part was the assurance given to him by the agent at the time the contract was entered into, the testimony as to which we have held to be in-

competent; but he says, at all events, the practice was inaugurated, was sanctioned by the company, and was relied upon by him; that, but for his reliance upon this course of business, he would have paid his premium at the date; that he was able to do so, and would have done so. To this the company replies, through its counsel, that there was nothing inconsistent in the company's receiving premiums after the day, since by the terms of the policy, although the insurance was in a lapsed condition by the failure to pay—that is, during the time covered by the period between maturity and payment—yet the insured had the right at any time to restore his *status* by paying the amount remaining due and unpaid. To this the counsel for complainant returns there could be no automatic renewal or revival of the policy because of the following provision appearing therein: "Payments of notes must be to the Continental Insurance Company at its office in Chicago, Illinois, or its office in New York, or to an authorized person having such note in possession for collection. The company may collect, by suit or otherwise, the premium note or notes, and a receipt from the office of the company must be received by the assured before there can be a revival of the policy, which shall in no event carry the insurance beyond the original term." Attention is called to the fact that according to this provision "a receipt from the office of the company must be received by the assured before there can be a revival of the policy," and that no such receipt from the office was ever sent to the com-

plainant. It is therefore insisted that the only proper interpretation of this course of business or mutual conduct of the parties was that the company was simply indulging the complainant with limited credit; the policy in the meantime being considered as in force.

The counsel for the defendant insists that this could not be the correct view of the matter, because on the 18th day of November, 1902, the defendant mailed to the complainant the following warning letter:

"Chicago, Illinois, Nov. 18, 1902.

"Mr. J. L. Johnson—Dear Sir: The second installment of your premium for insurance in this company will fall due on the first day of December (next month). The amount of said installment, and the number of the policy, are shown below.

"   .   .   .   Remittances may be made by express money order, etc.

".   .   .   We send you herewith an envelope addressed to us, in which please inclose the amount due, and your address as stated below, and forward to us.

"Do not fail to pay promptly, as the policy provides that insurance under it shall be suspended during delinquency of any part of your premium note.   .   .   .

"In order that your payment may be promptly credited, you will please fill out and sign the following blank letter, and return with your remittance. A receipt will be sent you within ten days. If unnecessary delay occurs, please advise us, giving number of policy, amount and date of remittance.

"In asking you for a prompt remittance of the amount falling due upon your note, we do so, not only because it is due, but because we feel its importance to you.

"No better investment can be made than to keep up a policy of insurance, . . . but, in order to pay its losses, a company must, in simple justice, receive pay for its policies. Can there be anything more unwise than to neglect payment of the small premium that guards you from disaster?

"CONTINENTAL INSURANCE COMPANY,

"G. E. KLINE, Vice Pres."

Attention is called to the fact that similar letters, relating to the second and third installments, were sent in November, 1903, and November, 1904. Likewise an additional letter was sent on December 15, 1904, after the due date for that installment of that year had passed, as follows:

"Chicago, Ill., Dec. 15, 1904.

"Mr. J. L. Johnson, Knoxville, Tenn., R. No. 7—Dear Sir: We have previously sent you notice of the maturity of your note given for insurance in this company, under policy No. 128,731, but have received no reply. We assume that our notice has miscarried or that you have some reason for not replying which we should be pleased to know. . . . Do not overlook the fact that insurance under the above policy is now in suspense, and that you have no protection under it while your premium past due remains unpaid. The amount of payment necessary to reinstate the insurance is $24.90.

"We trust that you will, without further delay, remit same to us by bank draft, or post office or express money order, drawn payable to the Continental Insurance Company, as per addressed envelope which we sent for your convenience with our former notice. We need not suggest to you that the company is in every way worthy of your confidence. The conduct of its business under the safety fund law makes its policy a particularly desirable one for a farmer, as the company could not fail by the burning of any large city. In replying, please quote the number of your policy.

"Very truly yours,

THE CONTINENTAL INSURANCE CO.

"GEORGE E. KLINE, Vice President."

It is insisted for the defendant that in view of the notices above copied, one, issued before maturity of the installment, warning the insured that in case of a failure to pay at maturity, the insurance would be suspended, and so remain during the delinquency, and the other, issued after the installment had become due, notifying him that by reason of nonpayment the insurance was then suspended, and that he would have no protection so long as the premium remained due and unpaid, he could not have been misled by indulgence into believing that the policy would not be suspended by failure to pay and would not remain in suspension so long as that failure should continue.

This seems to us the correct view of the matter. Opposed to this is only the single circumstance that, when

installments had been paid after maturity during the two previous years, no formal receipt was issued from the office at Chicago containing a notice that the insurance was by such payment reinstated. The only interpretation of this fact that seems to us reasonable is that the company and the insured mutually elected to treat the payment itself as a reinstatement of the policy.

Of course, however, there could be no reinstatement by payment after the subject-matter of the policy, the property, had been destroyed by fire, since there could be nothing upon which the policy could operate.

In the present case it appears that about the 15th of January, 1905, after the property had been destroyed by fire, the complainant went to the office of Blackburn Bros., and paid the overdue installment to a lady clerk in the office. When the payment was called to the attention of the company, together with the fact that the loss had occurred before the payment was made, it directed Blackburn Bros., to return the money to the complainant, and this was done. At the time that the complainant paid the money to the lady clerk, he did not inform her, or any one in the office, that the property had been already destroyed. When the money was returned to the complainant, the reason stated was that it had been received without knowledge of the fact that a loss had already occurred, and it was therefore returned.

We are of the opinion that the policy became suspended on December 2, 1904, and was in this condition

Johnson v. Insurance Co.

when the fire occurred on January 10, 1905; that the payment thereafter, under the circumstances stated, did not revive the policy; and that the company was under no obligation to receive or retain the payment so made after the loss had already occurred.

There is a wide distinction between the present case and *Life Insurance Co.* v. *Fallow*, 110 Tenn., 720, 77 S. W., 937, referred to in the brief of complainant's counsel.

It results that the decree of the chancellor must be reversed, and the bill dismissed.